IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No. 09-cv-2848-WDM-KMT

RICK GROSVENOR, on behalf of himself and all others similarly situated,

      Plaintiffs,

v.

QWEST COMMUNICATIONS INTERNATIONAL, INC., a Delaware corporation,
QWEST SERVICES CORPORATION, a Colorado corporation,
QWEST CORPORATION, a Colorado corporation,
QWEST COMMUNICATIONS CORPORATION, a Delaware corporation, and
QWEST BROADBAND SERVICES, INC., a Delaware corporation.

      Defendants.

---

## ORDER

---

Miller, J.

      This case is before me on Defendants Qwest Communications International, Inc., Qwest Services Corporation, Qwest Corporation, Qwest Communications Corporation, and Qwest Broadband Services, Inc.'s ("Qwest") Motion to Compel Arbitration (ECF No. 13) and Motion for Stay (ECF No. 62). I have reviewed the parties' written arguments and conclude that oral argument is not required. For the reasons that follow, the Motion to Compel Arbitration (ECF No. 13) will be denied. The Motion to Stay (ECF No. 62) will be denied.

## BACKGROUND

      Grosvenor claims that Qwest enticed him and other Qwest customers to purchase high-speed Internet service by promising a "Price for Life Guarantee" ("Price

for Life") but, after the customers agreed to subscribe to the service, Qwest routinely raised their monthly rates. Qwest contends that when Grosvenor subscribed to high speed Internet services, he agreed to its Subscriber Agreement, which requires arbitration of disputes, precluding Grosvenor's lawsuit in this forum.

The Subscriber Agreement "governs [the consumer's] use and Qwest's provision of Service, Software and Equipment." Subscriber Agreement at 1, ECF No. 13-1. The Subscriber Agreement is available to consumers at www. Qwest.com/legal. It provides that Qwest will supply equipment and services to provide a high speed Internet connection for the customer and the customer will pay Qwest for them. *See id.* In addition, it describes the consumer's responsibilities connected with the use of email, a website, web hosting services, web design services, and equipment. It notifies the consumer that he may not modify the software, that Qwest and third-party licensors are the owners of the intellectual property, that there are limitations on the use of the service, billing, and termination. *See id.* The Subscriber Agreement limits Qwest's liability. *See id.* Most importantly for this Motion, it requires that all disputes concerning the Subscriber Agreement be resolved by arbitration or in small claims court and not in a class action:

> 17. Dispute Resolution and Arbitration; Governing Law. PLEASE READ THIS SECTION CAREFULLY. IT AFFECTS RIGHTS THAT YOU MAY OTHERWISE HAVE. IT PROVIDES FOR RESOLUTION OF DISPUTES THROUGH MANDATORY ARBITRATION WITH A FAIR HEARING BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION.
>
> (a) Arbitration Terms. You agree that any dispute or claim arising out of or relating to the Services, Equipment, Software, or this Agreement (whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory) will be resolved by binding arbitration. The sole exceptions to arbitration are that either

party may pursue claims: (1) in small claims court that are within the scope of its jurisdiction, provided the matter remains in such court and advances only individual (non-class, non-representative, nonconsolidated) claims; and (2) in court if they relate solely to the collection of any debts you owe to Qwest.

*Id.* at ¶17 ("Arbitration Clause").

<u>Grosvenor's Initial Subscription to High Speed Internet Service in 2006</u>

Grosvenor subscribed to Qwest high-speed Internet service in 2006. Qwest claims that a clickwrap agreement was presented when Grosvenor installed the High Speed Internet Services ("Clickwrap Agreement") from a compact disk ("QuickConnect CD") at that time, which bound him under the Subscriber Agreement.

A clickwrap license (or "click-to-accept") is a common tool used by Internet merchants to obtain electronic signatures as agreement to terms of licensing contracts. *See Mortg. Plus, Inc. v. DocMagic, Inc.*, 2004 WL 2331918 (D. Kan. 2004). Clickwraps generally display a screen containing terms and conditions that the user must accept to continue to install or use the product. As a rule, a clickwrap is valid where the terms of the agreement appear on the same screen with the button the user must click to accept the terms and proceed with the installation of the product. *Id.* Typically, the user is asked whether he accepts all of the terms of the preceding agreement and is told that choosing "no" or "decline" will end set-up of the product. *Id.*

The Clickwrap Agreement, here, contains pages entitled "High-Speed Internet Modem Installation Legal Agreements" ("Legal Agreements Pages"). In pertinent part it states:

> Please read the terms ***including arbitration and limits on Qwest liability*** at www.qwest.com/legal ("Qwest

Agreement")[1] that govern your use and Qwest's provision of
the service(s) and equipment you ordered from the list
below. [Emphasis in the original].

- Qwest High-Speed Internet Service
- Qwest Choice™ Office Plus or Office Basic service
- Qwest-provided modem
- Qwest Home Network Backer™ or Office Network Backer™ service
- Microsoft Internet Software

Please also read the (1) information on term and early termination
fee, and (2) disclaimers and end user license agreement related to
this installation and software you receive during it ("Install
Agreements") in the scroll box below.

IMPORTANT, BINDING LEGAL INFORMATION.

Your click below on "I Accept" is an electronic signature and
acknowledges: (1) you agree the Qwest Agreement contains
the terms under which service and equipment are offered and
provided to you, (2) you understand and agree to such terms
(even if you don't read them), and (3) you understand and
agree to the Install Agreements.

Sur-reply at 2, ECF No. 53-1[2]; *see also*, Kohler Aff. ¶ 8; Ex. A at 2 (ECF No. 53-1).

The Legal Agreements Pages of the Clickwrap Agreement continue for ten pages

of "Important, Binding Legal Information," which include Install Agreements, Temporary

Internet Connection Disclaimer, End User License Agreement, Software Product

License, Limitation of Liability, and other General Provisions such as the Basis of

---

[1] "Qwest Agreement" is the Subscriber Agreement.

[2] While not expressly authorized by federal or local rules, a sur-reply is not
improper where it addresses facts or law  newly raised in the reply. *See Tnaib v.
Document Techs. LLC*, 450 F. Supp. 2d 87 (D.D.C. 2006).  Although Grosvenor did not
file a motion for leave to file a sur-reply, I find that the Sur-reply (ECF No. 53) addresses
issues and facts raised for the first time in the Reply (ECF No. 34).  Accordingly, I shall
consider the argument and evidence presented in the Sur-reply.

Bargain (Ex. A at 2–6, ECF No. 53-1), and Remedies and Legal Actions (*id.* at 6–7, § 7.2).

The Clickwrap Agreement section entitled, "Remedies and Legal Actions" (Section 7.2(b)), provides exclusive jurisdiction in the courts of San Mateo County, California or the United States District Court for the Northern District of California for disputes with SupportSoft, Inc. [a Qwest vendor].  *Id.*  Section 7.2(c) provides exclusive jurisdiction in the courts of Denver County, Colorado or the United States District Court for the District of Colorado for all other disputes concerning "this Agreement."  Section 7.2(d) provides a one-year limitation for bringing an action related to "this Agreement."

At the bottom of the Legal Agreement Pages, the customer is directed that:

> Your click on "I Accept" is an electronic signature to the agreements and contracts set out herein.  Please review the material in the above box for important, binding, legal information.

Kohler Aff. ¶ 9; Sur-Reply at 2, ECF No. 53-1 (similar but not identical language).  In order to complete installation of the high speed Internet services and configure the computer, Grosvenor would have been required to click on the "I Accept" button.  In order to refuse the terms of the Agreement, he would have had to click "Cancel."  *Id.* at ¶¶ 10–11.

The Legal Agreements Pages do not reproduce the Subscriber Agreement.  In order to read the Subscriber Agreement, Grosvenor would have had to exit the installation program, log onto the Internet (to which he did not yet have access), and navigate to the specific pages containing the Subscriber Agreement.  Having read the Subscriber Agreement, he would have had to reinsert the QuickConnect CD into his computer, read the remaining ten pages of the Legal Agreements Pages, and determine

5

whether he would accept or decline the terms of the agreements. *See* Sur-reply, Ex. A at 1, ECF No. 53-1

Qwest asserts its practice is to send a Welcome Letter to each of its new and renewing customers. *See* Aff. of Lucia Beardsley ¶¶ 1 & 10, ECF No. 34-1. After the closing signature, on the back of the letter, Qwest states:

> Qwest High-Speed Internet ® Service and related products are offered under the Subscriber Agreement terms, which are located at www.qwest.com/legal (<u>may also be enclosed</u>). Please review the terms, which include arbitration and limits on Qwest liability. If you do not agree, call Qwest to cancel your service within 30 days.

Reply, Ex. B at 3 (emphasis added), ECF No. 34-3.

Qwest also contends that Grosvenor received a Welcome Letter confirming his order when he first subscribed to the Qwest service in 2006, which provided him with sufficient notice of the terms of the Subscriber Agreement, including the Arbitration Clause, by referencing the location of the Subscriber Agreement on the Qwest website (www.qwest.com/legal). *See* Beardsley Decl. ¶¶ 5–10, ECF No. 34-1. Reply at 5, ECF No. 34.

Grosvenor states that he did not receive such a notice in 2006 and does not recall having received a Welcome Letter. *See* Grosvenor Decl. ¶ 8, ECF No. 26-23. When Grosvenor first subscribed to Qwest high speed Internet services in 2006, Price for Life was not among the pricing programs offered by Qwest. He states that he is very confident that Qwest never called his attention to the Subscriber Agreement's provision barring consumers from suing in any court other than small claims court or participation in a class action lawsuit. *Id.* at ¶¶ 10–11.

6

## 2007 Upgrade and Subscription to Price for Life

Grosvenor switched from his original plan to Price for Life in October 2007. He spoke to a customer service representative by telephone to make the switch. Grosvenor Decl. ¶ 6, ECF No. 26-23. Grosvenor states that, under Price for Life, he locked in the same monthly rate for as long as he maintained his Internet service with Qwest. Compl. ¶ 11, ECF No. 1. After he had signed up for Price for Life, he responded to an offer from Qwest for higher speed Internet services for an additional $5 per month. Again, he made the change by telephone. Grosvenor Decl. ¶ 6, ECF No. 26-23. In November 2007, he began to pay $31.99 for the service, which he expected to be the price he would pay "for life." Compl. ¶ 15, ECF No. 1.

Qwest contends that Grosvenor received a second Welcome Letter confirming his order when he upgraded his service in 2007. Beardsley Aff. ¶ 11, ECF No. 34-1. The 2007 letter is similar to the one Qwest was sending in 2006. *See* Ex. B to Beardsley Aff., ECF No. 34-3 Grosvenor does not recall having received a Welcome Letter when he changed to Price for Life or upgraded to a higher speed Internet service in 2007. Grosvenor Decl. ¶ 8, ECF No. 26-23. In addition, Grosvenor testifies that he did not have to install new software when he changed to Price for Life. *Id.* at ¶ 7. Qwest does not state that Grosvenor would have received a second QuickConnect CD to install Price for Life. *See id.*; *see also*, Beardsley Aff., ECF No. 34-1.

## 2008 Price Increase

In August 2008, Qwest's invoice to Grosvenor increased to $49.99 for a month's Internet service. *Id.* at ¶ 16. He complained to Qwest about the price increase. The customer service representative offered Grosvenor a different promotional offer, which

Grosvenor rejected. *Id.* at ¶ 17. He told the customer service representative that the only offer he had accepted was the $31.99 Price for Life. *Id.* In response, Qwest reduced Grosvenor's monthly Internet charge from $49.99 to $36.99. *Id.* Grosvenor accepted the new, higher price under protest. *Id.* at ¶ 18.

This lawsuit followed. The Complaint claims breach of contract; specifically, that the Price for Life Guarantee is an enforceable term of a contract between Grosvenor and Qwest. Compl. ¶¶ 34–38, ECF No. 1. In the alternative, Grosvenor claims Promissory Estoppel because the Price for Life Guarantee was a promise made by Qwest on which Grosvenor relied to his detriment and suffered damages. *Id.* at ¶¶ 39–44. He claims that Qwest was unjustly enriched by consumers in the Price for Life program who paid more than other customers receiving identical service. *Id.* at ¶¶ 45–49. He further claims violation of the Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101 *et seq. Id.* ¶¶ at 50–59.

Qwest has answered and moves the court to dismiss Grosvenor's complaint, to stay Grosvenor's claims, and to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 3[3] and Colorado law, or in the alternative, to dismiss the case while Grosvenor pursues his claim individually in small claims court.

<u>STANDARD OF REVIEW</u>

"A motion to compel arbitration under the Federal Arbitration Act is governed by a standard similar to that governing motions for summary judgment." *Stein v. Burt-Kuni*

---

[3] This Court's jurisdiction over the case depends on the arbitration issue. 9 U.S.C. § 4 (motion to compel arbitration under written agreement may be filed in federal district court "which, save for such agreement, would have jurisdiction under Title 28").

*One, LLC*, 396 F. Supp. 2d 1211, 1213 (D. Colo. 2005) (citing *SmartText Corp. v. Interland, Inc.*, 296 F. Supp.2d 1257, 1262 (D. Kan. 2003)).  Accordingly, "in this case, [Qwest] must present evidence sufficient to demonstrate an enforceable arbitration agreement."  *Id.* (citing *SmartText Corp.*, 296 F. Supp.2d at 1263).  "If this is shown, the burden shifts to [Grosvenor] to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56."  *Id.*; *see also*, 9 U.S.C. § 4.  "To accomplish this, the facts 'must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein.'"  *Adams v. Am. Guar. & Lab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quoting *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).  If Grosvenor "demonstrates a genuine issue of material fact, then a trial on the existence of the arbitration agreement is required."  *Stein*, 396 F. Supp. 2d at 1213 (citing 9 U.S.C. § 4); *see also*, *Aedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997) (holding that the district court must hold a jury trial on the existence of the agreement to arbitrate where the parties raise genuine issues of material fact regarding the making of the agreement to arbitrate).

<u>DISCUSSION</u>

<u>Jurisdiction to Determine Validity of Arbitration Agreement.</u>

Initially, I address whether I have jurisdiction to rule on the Motion to Compel Arbitration.  Under the Federal Arbitration Act, if a party challenges the validity of an agreement to submit disputes over the agreement to arbitrate at issue, the court must consider the challenge before ordering compliance with that agreement.  *Rent-a-Center v. Jackson*, 130 S.Ct. 2772 (June 21, 2010).  If a party challenges the enforceability of

the agreement as a whole, the challenge is for the arbitrator. *Id.* "Courts should not assume that the parties agree to arbitrate arbitrability unless there is a clea[r] and unmistakeabl[e] evidence that they did so." *Id.* at 2278 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also*, *AT&T Techs., Inc. v. Comm'cns. Workers*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

Qwest argues that, not only must Grosvenor arbitrate, an arbitrator must make the decision whether the Subscriber Agreement requires arbitration. In support of this contention, Qwest cites *Pikes Peak Nephrology Assocs., P.C. v. Total Renal Care, Inc.*, 2010 WL 1348326 (D. Colo. 2010) ("*PPNA*"). *See* Defs'. Notice of Supplemental Authority in Support of their Mot. to Compel Arbitration & Mot. for Stay (ECF No. 60). *PPNA* holds that where the parties agree to arbitrate under AAA rules, they agree to the procedural rules of AAA, unless the party indicates otherwise in the contract. *See PPNA*; *see also*, *P&P Indus., Inc. v. Sutter Corp.,* 179 F.3d 861, 867 (10th Cir. 1999). The parties must still "clearly and unmistakably" give the arbitrator exclusive authority to decide whether the agreement is enforceable. *Rent-a-Center*, 130 S.Ct. at 2275.

In *PPNA*, there are two arbitration agreements at issue (one drafted and executed in 1998 and one drafted and executed in 2005). The *PPNA* 1998 agreement states: "Any controversy, dispute or claim arising out of or in connection with this Agreement, or the *breach*, termination or *validity* hereof, shall be settled by final and binding arbitration" *Id.* at *6 (emphasis in *PPNA*). Further, the parties were required to first negotiate a resolution of "'[disputes arising] . . . under [the] Agreement.' If

negotiation fails, 'the dispute [except for alleged breaches of the non-competition and non-solicitation provision] shall be settled by final and binding arbitration . . . in accordance with the Commercial Arbitration Rules of the [AAA]." *Id.* at *6 (emphasis added).

The Qwest Arbitration Procedures are much more general:

> (I) *Arbitration Procedures.* Before commencing arbitration
> you must first present any claim or dispute to Qwest in
> writing to allow Qwest the opportunity to resolve the dispute.
> If the claim or dispute is not resolved within 60 days, you
> may request arbitration. The arbitration shall be conducted
> by the American Arbitration Association ("AAA").

Subscriber Agreement ¶ 17(a)(I), ECF No. 13-1. They do not incorporate by reference the specific AAA rules, nor do they state that the validity of the Arbitration Terms shall be decided by the arbitrator, as *PPNA* does.

Having expressly incorporated the AAA Rules by reference in the contract, Rule 7 of the AAA Rules provides: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* Accordingly, under these terms, the arbitrator was to decide questions of jurisdiction.

In contrast, Qwest's Arbitration Procedures do not expressly incorporate specific AAA Rules. Accordingly, the Arbitration Procedures are not a "clear and unmistakable" choice of arbitration of the validity of whether the parties agreed to arbitrate.

Qwest also cites *Rent-a-Center, West, Inc. v. Jackson*, 130 S.Ct. 2772 (2010) for the proposition that the arbitrator should decide the validity of the Arbitration Clause contained in the Subscriber Agreement. *Rent-a-Center* is distinguishable for two

reasons. First, in *Rent-a-Center*, Jackson challenged the contract as a whole, not the arbitration clause. Here the challenge is to the arbitration clause, not the Subscriber Agreement as a whole. Grosvenor argues only that the dispute resolution provision is unconscionable pursuant to factors set forth in *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986). *See* Resp. Part B, ECF No. 26.

Second, the *Rent-a-Center* arbitration clause states expressly: "The Arbitrator . . . shall have exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." *Id.* at 2777. In contrast, as noted above, the Arbitration Procedures do not mention the power of the arbitrator to resolve enforceability of the Subscriber Agreement. Accordingly, the Qwest Arbitration Clause does not give clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.[4]

In these circumstances, I find that the Qwest Arbitration Clause does not specify

---

[4]Qwest also offers *Stolt-Nielson, S.A. v. Animal Feeds Int'l. Corp.*, 130 S.Ct. 1758 (April 27, 2010). *Stolt-Nielson, S.A.* holds that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so. Accordingly, where a contract is silent, the court cannot provide a term that would fundamentally change the nature of the proceeding. Here, the Qwest Subscriber Agreement is not silent. Qwest's Subscriber Agreement requires arbitration and prohibits any court action other than in small claims court and specifically bars class actions. Consequently, the issue is one of formation, not construction. Accordingly, *Stolt-Nielsen* is not relevant to the issue at hand.

In addition, Qwest uses *Stolt-Nielsen* to raise the issue of class arbitration for the first time. The Arbitration Clause clearly differentiates between arbitration on one hand and court actions "by a judge or jury or through a class action" on the other hand. *See* ECF No. 13-1 ¶ 17. Neither party connected arbitration with a class arbitration prior to Defendants'Notice of Supplemental Authority in Support of their Mot. to Compel Arbitration and Mot. to Stay (ECF No. 60). Accordingly, class arbitration is not only irrelevant to the issue at hand; it is improperly raised. Grosvenor has no opportunity to respond to the argument that class arbitration would be improper in this matter. I do not consider *Stolt-Nielsen* for this proposition.

that an arbitrator is to determine issues of arbitrability. Accordingly, this court should determine whether a valid arbitration clause exists.

Existence of Valid Arbitration Clause

In its Motion to Compel Arbitration, Qwest relies on the general federal policy favoring arbitration of disputes. The presumption in favor of arbitration falls away, however, "when the parties dispute the existence of a valid arbitration agreement." *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002). "The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Aedon Eng'g, Inc.*, 126 F.3d at 1287.

The Tenth Circuit relies on state law principles of contract formation to determine whether parties have agreed to arbitrate an issue or claim. *Aedon Eng'g, Inc.*, 126 F.3d at 1287. Colorado applies principles governing contract formation to determine whether parties have agreed to submit a claim to arbitration. *Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003). "A contract is formed when an offer is made and accepted . . . and the agreement is supported by consideration. . . . Acceptance of an offer is generally defined as words or conduct that, when objectively viewed, manifests an intent to accept an offer. *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008) (internal citations omitted). I must construe the language of any arbitration agreement to give effect to the parties' intent as determined from the plain language of the agreement. *Pacheco*, 71 P.3d at 378.

To prevail on its motion, Qwest must show sufficient evidence that an enforceable contract exists. *See SmartText Corp.*, 296 F. Supp. 2d 1257 (D. Kan. 2003). In support of its claim that the Subscriber Agreement and Arbitration Clause are

13

enforceable, Qwest presents the two pieces of evidence introduced above—the QuickConnect CD that requires an electronic signature and references the Subscriber Agreement and the Welcome Letter which mentions the requirement to arbitrate.

1.  *Electronic Signature*

Qwest claims that Grosvenor signed his electronic signature to Qwest's Clickwrap Agreement when he activated the QuickConnect CD containing the software for Qwest high speed Internet service in 2006, and that it applies to Price for Life as well as the original high speed Internet services.  Reply at 5–6, ECF No. 34 (citing Kohler Aff., ECF No. 34-4).

Courts have found clickwrap agreements to be valid and binding.  For instance, in *Mortg. Plus, Inc.*, the defendant, DocMagic, Inc., supplied its software on a CD and presented its terms of agreement on a scrollable window on the same page as the acceptance button.  The buyer (or user), here Mortgage Plus, Inc., was required to affirmatively click the "Yes" button to assent to the Software Licensing Agreement as a prerequisite to installing the software.  *Mortg. Plus*, 2004 WL 2331918 at *5.  The court stated that Mortgage Plus, Inc. had "a choice as to whether to download the software and utilize the related services; thus, . . . installation and use of the software with the attached license constituted an affirmative acceptance of the license terms by Mortgage Plus and the licensing agreement became effective upon this affirmative assent."  *Id.* The court found that DocMagic, Inc.'s clickwrap agreement was a valid contract for the enclosed software.  *Id.*; *see also*, *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 781–83 (N.D. Tex. 2006) (website provided terms in scrollable window on same page as the button to accept those terms); *Caspi v.*

14

*Microsoft Network, L.L.C.*, 732 A.2d 528, 530 ("I Agree" and "I Don't Agree" buttons appear on same page as scroll down window containing terms of agreement); *Barnett v. Network Solutions, Inc.*, 38 S.W.3d 200 (Tex. App. 2001) (determining clickwrap contract with forum selection clause valid where plaintiff had to scroll through portion of contract to find clause).

Another example of an approved clickwrap agreement is *Hugger-Mugger L.L.C. v. Netsuite, Inc.*, 2005 WL 2206128 (D. Utah 2005). In *Hugger-Mugger L.L.C.*, the License Agreement expressly incorporated by reference certain "Terms of Service," which were posted online by Netsuite, Inc. The "Terms of Service" document was not physically attached to the written License Agreement but its online location was printed in the License Agreement as part of the incorporation clause.

Specifically, the Netsuite, Inc. License Agreement stated:

> In consideration of the license fee paid by Customer [Hugger-Mugger] and *subject to the terms of this agreement and the Terms of Service posted at www.NetSuite.com*, or successor Web site, NetSuite grants Customer, its employees, and agents a nonexclusive, nontransferable license to use the Service for internal business purposes. . . .

*Id.* at *2 (emphasis added in *Hugger-Mugger L.L.C. v. Netsuite, Inc.*).

Qwest's Clickwrap Agreement is unlike any of the clickwraps described above. The Qwest Subscriber Agreement and the Arbitration Clause do not appear on the same scroll down box or page as the "I Accept" and the "I Do Not Accept" buttons. Unlike the Netsuite, Inc. clickwrap, the Subscriber Agreement is referenced by the Legal Agreements page but it is not expressly incorporated into the Clickwrap Agreement:

> Please read the terms ***including arbitration and limits on Qwest liability*** at www.qwest.com/legal ("Qwest Agreement") that govern your use and Qwest's provision of the service(s) and equipment you ordered from the list below.

*See* Kohler Aff. ¶ 4 (emphasis in the original), ECF No. 34-4. This is the sole reference to the Subscriber Agreement in ten pages of agreements, which include Install Agreements, Temporary Internet Connection Disclaimer, End User License Agreement, Software Product License, Limitation of Liability, and other General Provisions such as the Basis of Bargain (Ex. A at 2–6, ECF No. 53-1), and Remedies and Legal Actions (*id.* at 6–7, § 7.2) (providing exclusive jurisdiction for dispute resolution in the courts of San Mateo County, California or Denver, Colorado, or the United States Districts in which these counties are located and providing a one-year limitation for filing actions).

As presented, the Clickwrap Agreement does not clearly incorporate the Subscriber Agreement by reference and to reach the arbitration clause requires the user to leave the installation program, log onto the Internet (if possible), navigate to the proper page, and read the Subscriber Agreement, then return to the installation program's scroll down window to read the remaining ten pages of the High-Speed Internet Modem Installation Legal Agreement before choosing whether to agree to the terms. In addition, the arbitration issue is confused by the fact that the readily available agreements that provide a forum in the court system for resolution of conflicts springing from the scroll box contracts. This creates an ambiguity regarding recourse in the event of a dispute. These circumstances demonstrate a genuine issue of fact.

      2.     *Welcome Letter*

As noted above, after the closing of the Welcome Letters, on the back of the

page, readers are informed:

> Qwest High-Speed Internet ® Service and related products are offered under the Subscriber Agreement terms, which are located at www.qwest.com/legal (<u>may also be enclosed</u>). Please review the terms, which include arbitration and limits on Qwest liability. If you do not agree, call Qwest to cancel your service within 30 days.

Reply, Ex. B at 3 (emphasis added), ECF No. 34-3. From this language, it is uncertain whether any letter contained an actual copy of the Subscriber Agreement because it may or may not have been enclosed. However, the reader is asked to review the terms of the Subscriber Agreement on the Qwest website and is given thirty days in which to review the terms. *Id.* The thirty-day look-back period is significant because it gives the consumer time to set up his Internet service, log-on to the Qwest website to examine the terms of the Subscription Agreement, and reject the terms by canceling his subscription.

*Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1103 (C.D. Cal. 2002) presents a similar situation. In *Bischoff*, DirecTV provided the customer with an arbitration agreement after the parties had entered a contract for satellite programming, which was delivered after the customer had purchased the equipment and after DirecTV had activated the service. *Id.* The *Bischoff* court held that the arbitration agreement was valid, noting, "[p]ractical business realities make it unrealistic to expect DirecTV, or any television programming service provider for that matter, to negotiate all of the terms of their customer contracts, including arbitration provisions, with each customer before initiating service." *Id.* at 1105.

However, Grosvenor has raised material questions of fact as to contract

formation, including: whether he ever received the Subscriber Agreement, and whether he received the Welcome Letters.

Grosvenor also questions whether the Subscription Agreement, containing the Arbitration Clause that Qwest was using at the time Grosvenor subscribed to Price for Life, applies to the program. Resp. at 7–8, ECF No. 26. He argues that a form agreement is part of a contract only if the plaintiff was aware of it and assented to it. *Id.* at 7 (citing *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1465 (10th Cir. 1994) (no implied contract where employee unaware of document prior to termination)).

Grosvenor also contends that he has not alleged that Qwest breached the Subscriber Agreement. Resp. at 7, ECF No. 26. He alleges that Qwest breached its contract to provide Internet services at a set "Price for Life." Compl. ¶¶ 34–38, ECF No. 1. He reiterates that the Subscriber Agreement was not a part of his agreement with Qwest because Qwest did not inform him of the terms of the Subscriber Agreement when he enrolled in Price for Life. Resp. at 7–8, ECF No. 26; Grosvenor Decl. ¶ 10, ECF No. 26-23.

Qwest counters that Grosvenor cannot state that he never agreed to the Subscriber Agreement because Grosvenor admits that he agreed to the Subscriber Agreement in the Complaint where he stated that customers like him "entered into contracts" for Price for Life [High Speed Internet] service." (Reply at 9 (citing Compl. ¶ 1, (ECF No. 1)), ECF No. 34) and that the "Price for Life Guarantee is an enforceable term of the contract which Mr. Grosvenor . . . entered with Qwest relating to Qwest's [I]nternet service." *Id.* (citing Compl. ¶ 35).

Again, the circumstances present genuine issues of fact as to whether Grosvenor

18

agreed to arbitrate his claims, precluding a ruling as a matter of law.  *See Stein*, 396 F.

Supp. 2d at 1213 (citing 9 U.S.C. § 4); *see also*, *Aedon Eng'g, Inc.*, 126 F.3d at 1283.

      C.    <u>Motion to Stay</u>

Qwest filed Defendants' Notice of Supplemental Authority in Support of Their

Motion to Compel Arbitration and Motion for Stay (ECF No. 62) pending a decision in

*AT&T Mobility, LLC v. Concepcion*, 130 S.Ct. 3322 (*cert. granted*, May 24, 2010).

Qwest requests that I stay the Motion pending the United States Supreme

Court's decision in *Concepcion*, on the basis that it presents issues similar to those

before me on the Motion to Compel Arbitration.  The issue raised by AT&T Mobility, LLC

is "[w]hether the FAA preempts States from conditioning the enforcement of an

arbitration agreement on the availability of particular procedures—here, class-wide

arbitration, when those procedures are not necessary to ensure that the parties to the

arbitration agreement are able to vindicate their claims."  *Id.* at 2.  *Concepcion* concerns

the California unconscionability law and its unique test for contracts requiring that

disputes be resolved on an individual basis.  Pet. for Cert at 5.  My review of the Petition

for Certiorari reveals that the outcome of *Concepcion* is not likely to affect my decision

on the Motion to Compel Arbitration.

Accordingly, it is ORDERED that:

      1.    Defendants Qwest Communications International, Inc., Qwest Services

              Corporation, Qwest Corporation, Qwest Communications Corporation, and

              Qwest Broadband Services, Inc.'s Motion to Compel Arbitration (ECF No.

              13) is denied;

      2.    The Motion for Stay (ECF No. 62) is denied;

3.	The parties shall schedule a trial to determine whether a valid arbitration

agreement exists.

DATED at Denver, Colorado on September 30, 2010.

BY THE COURT:

s/ Walker D. Miller
United States Senior District Judge