**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 09-cv-02848-WDM-KMT

RICHARD GROSVENOR, on behalf of himself and all others similarly situated,

    Plaintiff,

vs.

QWEST CORPORATION, a Colorado corporation,
QWEST BROADBAND SERVICES, INC., a Delaware corporation,

    Defendants.

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BASED ON ILLUSORY
NATURE OF SUBSCRIBER AGREEMENT**

## TABLE OF CONTENTS

**Page No.**

I. INTRODUCTION ..................................................................................................1
II. STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................2
III. ARGUMENT..........................................................................................................6
IV. CONCLUSION......................................................................................................9

## TABLE OF AUTHORITIES

**Page No.**

### FEDERAL CASES

*Dumais v. Am. Golf Corp.*,
 299 F.3d 1216 (10th Cir. 2002) ................................................................................... 6

*Feldman v. Jobson Pub., LLC*,
 Civ. Act. 04-cv-1185-WDM-PAC, 2005 WL 2396938
 (D. Colo. Sept. 28, 2005) ............................................................................................ 6

*Hardin v. First Cash Fin. Servs.*,
 465 F.3d 470 (10th Cir. 2006) ..................................................................................... 6

*Hirschi v. Newcastle Props., Inc.*,
 Civ. Act. 06-cv-01424-PSF-MJW, 2006 WL 2927493
 (D. Colo. Oct. 12, 2006) ............................................................................................. 6

*Hooters of Am., Inc. v. Phillips*,
 173 F.3d 933 (4th Cir. 1999) ....................................................................................... 7

*Lumuenemo v. Citigroup Inc.*,
 Civ. Act. 08-cv-00830-WYD-BNB, 2009 WL 371901
 (D. Colo. Feb. 12, 2009) ............................................................................................. 7

*Stein v. Burt-Kuni One, LLC*,
 396 F. Supp. 2d 1211 (D. Colo. 2005) ........................................................................ 6

### OTHER AUTHORITIES

RESTATEMENT (SECOND) OF CONTRACTS § 77 .............................................................................. 8

# I. INTRODUCTION

Plaintiff Richard Grosvenor maintains that Defendants Qwest Corporation and Qwest Broadband Services, Inc. (together "Qwest"), never presented him with a copy of the Qwest High-Speed Internet™ Subscriber Agreement ("Subscriber Agreement"), either in hard copy or electronically. As this Court already has concluded, for that and other reasons there are genuine issues of material fact as to whether Mr. Grosvenor assented to the inclusion of the Subscriber Agreement in his contractual relationship with Qwest, precluding summary judgment on that contract formation issue.

But there are no issues of material fact as to another contract formation issue. Qwest reserved to itself the unfettered right to amend the Subscriber Agreement at any time. It has repeatedly exercised that right to amend, including during the period in which Mr. Grosvenor had service. Pursuant to the decision of the Tenth Circuit Court of Appeals in *Dumais v. Am. Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002), which this Court has followed twice, these undisputed facts make the Subscriber Agreement illusory and hence not part of the contract between Mr. Grosvenor and Qwest.

Moreover, the Subscriber Agreement requires any customer to present any dispute to Qwest in writing and wait 60 days before commencing arbitration. This gives ample time to Qwest to amend the Subscriber Agreement to vitiate any dispute or make it even more impossible than Qwest already has to pursue a claim in arbitration. The combination of the unfettered right to amend and the 60-day notice requirement makes Qwest's Dispute Resolution Provision (section 17 of the Subscriber Agreement) illusory.

The Court therefore should grant this motion for summary judgment and hold that the Subscriber Agreement in general, and the Dispute Resolution Provision in particular, are illusory and hence not part of the contract between Qwest and Mr. Grosvenor.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Richard Grosvenor, the Plaintiff in this case, subscribed to Qwest's high speed internet ("HSI") service between about July 24, 2006 and February 2010. Declaration of Beth E. Terrell in Support of Plaintiff's Motion for Summary Judgment Based on Illusory Nature of Subscriber Agreement ("Terrell Decl."), Ex. 1 (Grosvenor Tr.) at 128:3-10, 135:21-25, 137:8-19, and 139:21-25. (The period during which he had HSI service is called the "Service Period.").

2. Qwest provided the HSI service to which Mr. Grosvenor subscribed. *See* Stipulated Mot. to Dismiss Certain Parties (Dkt. # 100), filed April 21, 2011, page 1 ¶ 1.

3. Defendants contend that versions of the Qwest High-Speed Internet™ Subscriber Agreement ("Subscriber Agreement") that were in effect during the Service Period contained certain terms and conditions pursuant to which Qwest has provided the HSI service to Plaintiffs. Aff. of Jesse Kohler, ¶ 7 (Dkt. # 34-5), filed March 11, 2010 ¶ 7.[1]

4. Section 4 of each version of the Subscriber Agreement that was in effect during the Service Period has been entitled "Changes to Service or this Agreement." Section 4 of Version 4, which is dated April 29, 2006, provided:

> Qwest is not obligated to give you notice of changes to this Agreement before it becomes effective. You should review the Agreement at the time it becomes effective for you. Subject to any applicable rules or laws, Qwest may:
>
> (a) at any time, effective upon posting to www.qwest.com/legal or any written notice to you, including e-mail: (i) stop offering the Service and/or rental Equipment, (ii) modify the Service and/or any of the terms and conditions of this Agreement, and/or (iii) reduce MRCs [monthly recurring charges] or NRCs [non-recurring, one-time charges]. Please check such Web site and your e-mail regularly for changes.
>
> (b) upon 30 days notice to you: (i) increase MRCs and/or NRCs or (ii) change this Agreement or the Service in a way that directly results in a material and adverse economic impact to you.

---

[1] Plaintiff disputes that he ever assented to the inclusion of the Subscriber Agreement in his contract with Qwest, and believes that there are genuine issues of material fact as to whether he assented. For purposes of this motion only, he does not raise those disputes.

> Qwest may reduce the foregoing notice period where commercially reasonable and/or if such increase is based upon Regulatory Activity.
>
> Your continued use of the Service and/or Equipment constitutes acceptance of those changes. You must immediately stop using the Service and Equipment and cancel your Service if you do not agree to the changes. Any changes or other terms you make to this Agreement, or propose in any other documents, written or electronic, are void.

Terrell Decl., Ex. 2 (Version 4 of Subscriber Agreement) at page. 7 ¶ 4.

5. Version 24 was the last version that Qwest produced with a date before Mr. Grosvenor's service terminated. Terrell Decl. ¶ 4. During the Service Period Qwest had at least 20 versions of the Subscriber Agreement. *Id.*

6. Each version of the Subscriber Agreement adopted during the Service Period contained at least one change from the prior version.

7. Section 4 of Version 24 was identical to Section 4 in Version 4, except for underling and for the language of the last sentence, which had been changed to read, "Any changes you make or other terms you add to this Agreement, or propose in any other documents, written or electronic, are void." Terrell Decl., Ex. 3 (Version 24 of Subscriber Agreement) at page 9 ¶ 4.

8. Qwest did not provide written notice to Mr. Grosvenor of any of the changes to the Subscriber Agreement, except by posting the new version on www.qwest.com/legal.[2]

9. When Qwest posted the new version on the website, it did not identify the amendments or even indicate that a new version had been posted, other than by the version

---

[2] This is a negative inference from the facts that Qwest has not produced any notices to customers of changes to the Subscriber Agreement and that Mr. Grosvenor does not remember receiving any such notices; indeed, he was unaware of the Subscriber Agreement before he contacted counsel about filing this case. Terrell Decl. Exhibit 1 (Grosvenor Tr.) at 171: 7-25.

number and version date.[3]  Unless a customer had saved the prior version of the Subscriber Agreement and then read the new version against the prior version, the customer could not have identified the changes in the new version.

   10.   The first two sentences of Section 17(a)(i) of Version 4 of the Subscriber Agreement provided:

> Before commencing arbitration you must first present any claim or dispute to Qwest in writing to allow Qwest the opportunity to resolve the dispute.  If the claim or dispute is not resolved within 60 days, you may request arbitration.

Terrell Decl., Ex. 2 (Version 4 of the Subscriber Agreement) at page 17, ¶ 17(a)(i).

   11.   The first two sentences of Section 17(a)(i) of Version 24 were identical to the first two sentences of Section 17(a)(i) of Version 4.  Terrell Decl., Ex. 3 (Version 24 of Subscriber Agreement) at page 15 ¶ 17(a)(i).

   12.   The first three sentences of Section 12(a), entitled "30-Day Cancellation Policy," of Version 4 of the Subscriber Agreement provided:

> You may cancel Service and return the Equipment within 30 days following your order/purchase of such Service or Equipment and avoid payment of MRCs if:  (i) you are a new Service customer …, and (iii) you notify Qwest you wish to cancel Service because you do not agree with the terms and conditions of this Agreement.  You must pay all NRCs related to canceled Service, including without limitation installation, maintenance and shipping charges.  You must also pay MRCs related to canceled Service and any termination liability charges (if you ordered Service with a term commitment) if you cancel Service and return Equipment (iv) more than 30 days after ordering ….

Terrell Decl., Ex. 2 (Version 4 of the Subscriber Agreement) at page 12 ¶ 12(a).

---

[3] This is a negative inference from the facts that Qwest has not produced any documents for posting on its website identifying changes to the Subscriber Agreement and that the website currently does not have such an explanatory document.  Terrell Decl. ¶ 5; *see* www.qwest.com/legal and www.qwest.com/legal/highspeedinternetsubscriberagreement/ (last visited June 13, 2011).

- 4 -

13. The first three sentences of Section 12(a) of Version 24 had been modified in several respects from the first three sentences of Section 12(a) of Version 4, but none of the changes altered the requirement that, to avoid imposition of an early termination charge, the customer must have been "a new Service customer" and the customer must have cancelled Service and returned the Equipment within 30 days after ordering the Service and/or Equipment. The sentences now provided:

> You may cancel Service and return the Equipment within 30 days following your order/purchase of such Service or Equipment and avoid payment of MRCs if: (i) you are a new Service customer …, and either (iii) you notify Qwest you wish to cancel Service because you do not agree with the terms and conditions of this Agreement, or (iv) you notify Qwest you wish to cancel because you are not satisfied with the Service. Except as provided below, you must pay all NRCs related to canceled Service, including without limitation installation, maintenance and shipping charges. You must also pay MRCs related to canceled Service and any termination liability charges (if you ordered Service with a term commitment) if you cancel Service and return Equipment: (v) more than 30 days after ordering ….

Terrell Decl., Ex. 3 (Version 24 of the Subscriber Agreement) at page 12 ¶ 12(a).

14. The fifth sentence of Section 12(c), entitled "Term Commitment and Early-Termination Charge," of Version 4 of the Subscriber Agreement provided:

> THE EARLY-TERMINATION CHARGE WILL BE WAIVED IF: (A) YOU NOTIFY QWEST WITHIN 30 DAYS OF THE DATE YOU ORDERED THE SERVICE WITH A TERM COMMITMENT THAT YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT AND (B) QWEST HAS NOT PERFORMED AND YOU HAVE NOT USED ANY OF THAT SERVICE.

Terrell Decl., Ex. 2 (Version 4 of the Subscriber Agreement) at page 12 ¶ 12(c).

15. The sixth sentence of Section 12(c) of Version 24 was identical to the fifth sentence of Section 12(c) of Version 4. Terrell Decl., Ex. 3 (Version 24 of the Subscriber Agreement) at page 12 ¶ 12(c).

- 5 -

### III. ARGUMENT

In *Dumais v. Am. Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002), the Tenth Circuit established that "an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory." 299 F.3d at 1219. Applying this principle, it held that an arbitration provision in an employee handbook was illusory and hence unenforceable because the handbook gave the employer "the right to amend, supplement, or revise everything in the Handbook," including, presumably, the arbitration provision. *Id.* at 1217, 1220.

This Court has twice followed *Dumais* by holding illusory arbitration provisions that gave one party the unfettered power to modify the provisions. *See Feldman v. Jobson Pub., LLC*, Civ. Act. 04-cv-1185-WDM-PAC, 2005 WL 2396938, at *3 (D. Colo. Sept. 28, 2005) (holding illusory arbitration provision in employee handbook under which employer may "amend, reverse, modify, suspend, interpret or cancel any policy or provision [including the Arbitration Procedure] at any time with or without notice at its own discretion"); *Stein v. Burt-Kuni One, LLC,* 396 F. Supp. 2d 1211, 1214-1215 (D. Colo. 2009) (holding illusory arbitration provision in employee handbook under which employer "reserves the right to add, change or delete benefits and policies as it deems appropriate in its sole and absolute discretion"); *see also Hirschi v. Newcastle Props., Inc.*, Civ. Act. 06-cv-01424-PSF-MJW, 2006 WL 2927493, at *2 (D. Colo. Oct. 12, 2006) (Figa, J.) (holding illusory arbitration provision in employee handbook under which employer "retains the right to change these policies, procedures and employee benefits at any time without prior notice").

The result is different when the drafter agrees to restrictions on its right to amend the arbitration provision. In *Hardin v. First Cash Fin. Servs.*, 465 F.3d 470 (10th Cir. 2006), the Tenth Circuit concluded that an arbitration provision was not illusory because the defendant had agreed to provide ten-days notice of any changes, not amend the agreement if it had actual notice

of a potential dispute or claim, and not terminate the agreement as to any claims that arose prior to the date of termination. 465 F.3d at 478. And in *Lumuenemo v. Citigroup Inc.*, Civ. Act. 08-cv-00830-WYD-BNB, 2009 WL 371901 (D. Colo. Feb. 12, 2009), Chief Judge Daniel similarly concluded that an arbitration provision was not illusory because defendant had agreed that any modification would become effective only upon 30-days notice and would apply only prospectively. 2009 WL 371901 at *5.

Qwest was unwilling to restrict its right to amend the Subscriber Agreement in any way. It did not, as in *Hardin*, agree not to amend the Dispute Resolution Provision of the Subscriber Agreement if the company had actual notice of a potential dispute or claim. It did not, as in *Hardin* and *Lumuenemo*, agree that any amendments would apply only prospectively. *See Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999) (holding agreement illusory partly because "[n]othing in the rules even prohibits Hooters from changing the rules in the middle of an arbitration proceeding"). And it did not, as in both *Hardin* and *Lumuenemo*, provide for advance notice of changes, unless in Qwest's judgment a change "directly results in a material and adverse economic impact" to customers, which it never did. Section 4 of the Subscriber Agreement stated, "Qwest is not obligated to give you notice of changes to this Agreement before it becomes effective." (Statement of Undisputed Material Facts, *supra* ("Facts") 4, 7.)

Indeed, even any after-the-fact notice existed only in theory. Qwest reserved to itself the option, for each of the changes to the Subscriber Agreement during the Service Period, either to provide written notice to customers or post the new version of the Agreement on its website. (Facts 4-7.) And it always chose the easy route of posting the new version of the Agreement on the website rather than sending it to customers. (Fact 8.) This option effectively meant that Qwest gave no notice of its amendments at all. It is unreasonable to expect customers to check Qwest's website regularly to see if the Subscriber Agreement had been amended in any way.

Even if they did, Qwest did not identify the changes. As a result, any curious customer would require access to the former version of the Subscriber Agreement and compare the two versions to identify the changes. (Fact 9.)

Finally, even if Mr. Grosvenor or another member of his proposed class somehow became aware of an amendment to the Subscriber Agreement, there was nothing they could do about it. Unless he somehow happened to become aware of the Subscriber Agreement without using the HSI service (which would be extremely difficult to do because he needed the service to access Qwest's website), he had accepted the amendment under the terms of the Subscriber Agreement. (Facts 4, 7) ("Your continued use of the Service and/or Equipment [after an amendment becomes effective by posting] constitutes acceptance of those changes"). And even if he was not deemed to accept, he would face a variety of charges, including an early termination fee, if he cancelled service because of an amendment. The Subscriber Agreement provided that an ETF would be waived only if Mr. Grosvenor (or any other user) was a new customer and within the first 30 days after ordering service. (Facts 12-15.)

For these reasons, the entire Subscriber Agreement, including the Dispute Resolution Provision, is illusory. No contract was formed as to it.[4]

If the Court nonetheless concludes that the entire Subscriber Agreement should not be declared illusory, there is especial reason to conclude that no contract was formed as to the Dispute Resolution Provision. Throughout the Service Period, Section 17 required customers to "present any claim or dispute to Qwest in writing to allow Qwest the opportunity to resolve the

---

[4] *Dumais* and its progeny all dealt with employee handbooks or related employment documents addressing at-will relationships in which there was no question that an enforceable contract had not been formed as to most provisions. Thus, the courts in those cases dealt only with whether a contract had been formed concerning the arbitration provision. The rationale for invalidating a contract in which one party's obligations are illusory, however, is general in nature, not limited to arbitration provisions. *See* RESTATEMENT (SECOND) OF CONTRACTS § 77 (addressing contracts without mutual consideration because one party's purported obligations are illusory).

dispute" and to commence arbitration only after at least 60 days had passed without resolution of the claim or dispute. (Facts 10-11.) Qwest had the power, during those 60 days, to change the Dispute Resolution Provision or any other provision of the Subscriber Agreement so as to alter procedural, liability or damages rules in a way that damaged the customer's claim. For reasons that Mr. Grosvenor has already explained (*see* Plaintiff's Opp. to Defs.' Mot. to Compel Arbitration (Dkt. #26), filed February 8, 2010), the Dispute Resolution Provision was procedurally and substantively unconscionable; the power to amend took the Provision from unconscionable to illusory.

## IV. CONCLUSION

The Court should grant Mr. Grosvenor's motion for summary judgment and declare that the entire Subscriber Agreement, or at least the Dispute Resolution Provision, was not part of his agreement with Qwest because the company's unfettered power to amend made its apparent obligations illusory.

DATED this 13th day of June, 2011.

                TERRELL MARSHALL DAUDT & WILLIE PLLC


                By:  /s/ Beth E. Terrell
                    Beth E. Terrell
                    Toby J. Marshall
                    Kimberlee L. Gunning
                    936 North 34th Street, Suite 400
                    Seattle, Washington  98103-8869
                    Telephone: (206) 816-6603
                    Facsimile: (206) 350-3528
                    Email: bterrell@tmdwlaw.com
                    Email:  tmarshall@tmdwlaw.com
                    Email:  kgunning@tmdwlaw.com

- 10 -

        Jeffrey A. Berens
        Darby K. Kennedy
        DYER & BERENS LLP
        303 East 17th Avenue, Suite 300
        Denver, Colorado 80203
        Telephone: (303) 861-1764
        Facsimile: (303) 395-0393
        Email: jeff@dyerberens.com
        Email: darby@dyerberens.com

        Michael D. Lieder
        SPRENGER & LANG, PLLC
        1400 Eye Street NW, Suite 500
        Washington, DC  20005
        Telephone:  (202) 265-8010
        Facsimile:  (202) 332-6652
        Email:   mlieder@sprengerlang.com

*Attorneys for Plaintiff Rick Grosvenor*

CERTIFICATE OF SERVICE

I, Beth E. Terrell, hereby certify that on June 13, 2011, I caused the foregoing to be electronically filed with the Clerk of the Court via the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

DATED at Seattle, Washington, this 13th day of June, 2011.

                TERRELL MARSHALL DAUDT & WILLIE PLLC

                By: /s/ Beth E. Terrell
                     Beth E. Terrell
                     936 North 34th Street, Suite 400
                     Seattle, Washington 98103-8869
                     Telephone: (206) 816-6603
                     Facsimile: (206) 350-3528
                     Email: bterrell@tmdwlaw.com

*Attorneys for Plaintiff Rick Grosvenor*