IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-02848-MSK-KMT

RICHARD GROSVENOR,

        Plaintiff,

v.

QWEST CORPORATION, and
QWEST BROADBAND SERVICES, INC.,

        Defendants.

---

OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to the Plaintiff's Motion for Summary Judgment **(# 105)**, the Defendants' response **(# 119)**, and the Plaintiff's reply **(# 126)**; and the Defendants' Motion for Summary Judgment **(# 106)**, the Plaintiff's response **(# 118)**, and the Defendants' reply **(# 128)**.

## <u>FACTS</u>

The key facts in this action are not in dispute. At bottom, Mr. Grosvenor alleges that Defendant Qwest solicited him to purchase internet service through a "Price for Life Guarantee," under which the monthly cost of such service would remain the same as long as Mr. Grosvenor remained a customer. He alleges that Qwest breached its contractual promise to provide service at a fixed price by subsequently raising the rate it charged him for internet service. Mr. Grosvenor's Complaint **(# 1)** alleges claims for breach of contract, promissory estoppel, unjust enrichment, and a claim under the Colorado Consumer Protection Act, ostensibly on behalf of a

1

putative class of Qwest internet customers.

However, the instant dispute focuses on a more narrow question.  Qwest provides internet service pursuant to a Subscriber Agreement that, among other things, requires the parties to arbitrate disputes arising under it and prohibits the maintenance of class actions in cases alleging breach of the agreement.  Shortly after this action was filed, Qwest moved (# 13) to compel arbitration of Mr. Grosvenor's claims.  By Order (# 65) dated September 30, 2010, Judge Miller denied Qwest's motion, finding that: (i) the Court, not an arbitrator, had jurisdiction over challenges to the validity of the agreement to arbitrate because the agreement did not provide for an arbitrator to determine that issue; (ii) there were genuine disputes of fact as to the circumstances under which Mr. Grosvenor agreed to Qwest's Subscriber Agreement (if at all), requiring further discovery.   Judge Miller directed that the parties "schedule a trial to determine whether a valid arbitration agreement exists."

The parties proceeded to conduct discovery with regard to disputes relating solely to contract formation, and now both parties seek summary judgment on the question of whether there is a binding and enforceable agreement to arbitrate the claims in Mr. Grosvenor's Complaint.  Qwest's motion (# 106), argues that the facts adduced in discovery indicate that Mr. Grosvenor accepted all of the terms of the Subscriber Agreement, and is thus bound to arbitrate his claims.  Mr. Grosvenor's motion (# 105) argues that any agreement to arbitrate is rendered illusory by the fact that Qwest claims an unfettered right to modify the arbitration provision. *Citing Dumais v. American Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002).

## ANALYSIS

**A.  Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if

no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and

a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross-motions for summary judgment.  "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently."  *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another").

**B.  Qwest's Motion**

Logically, the Court begins with Qwest's motion, insofar as the question of whether a contract was formed must precede the question of whether the terms of that contract might be illusory.

4

This motion presents the most fundamental of contract law questions – when is a contractual agreement formed.   The parties appear to agree that the matter is governed by Colorado law.  That law provides that a contract is formed "when one party makes an offer and the other party accepts it, and the agreement is supported by consideration." *Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128, 133 (Colo. App. 2009).  For a contract to arise, both parties must mutually assent to all essential element of the agreement.  *Federal Lumber Co. v. Wheeler*, 643 P.2d 31, 36 (Colo. 1981).  The terms of the offer must be sufficiently definite such that the promises and performances required of each party are reasonably certain.  *Watson v. Public Service Co.*, 207 P.3d 860, 868 (Colo.App. 2008).  If the parties agree as to some issues, but fail to reach a meeting of the minds as to other material issues, the contract is not sufficiently formed.  *DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1248 (Colo.App. 2001).  Whether a term is "essential" or "material" – such that there meeting of the minds by the parties as to that term's requirements – or whether the term is inessential to questions of contract formation is a matter that "must be determined from the intention of the parties as disclosed upon consideration of all surrounding facts and circumstances." *American Min. Co. v. Himrod-Kimball Mines Co.*, 235 P.2d 804, 807 (Colo. 1951).

This matter involves contract formation questions attendant to a party manifesting its agreement to a contract's terms by "clicking" on a button during installation of a software program.  Numerous courts have considered the contractual effect of such "clickwrap" or "click-through" agreements.  Perhaps the most detailed analysis of the unique issues presented in these circumstances is *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2001).  There, plaintiffs sought to assert claims relating to a software product they had downloaded from the

defendant's website.  The plaintiffs initiated the download from a webpage describing the software product and containing a button reading "Download."  *Id.* at 22.  Located some distance below the "Download" button was a statement reading "Please review and agree to the terms of the Netscape SmartDownload software license agreement before downloading and using the software."  *Id.* at 23.  Once downloaded, the program required no other manifestation of assent to its terms before the user began using it.[1]  *Id.*

None of the plaintiffs testified that they scrolled past the "Download" button to see the reference to the program's license terms, but the court explained what would have occurred had they done so.  By clicking on the "Please review and agree . . ." sentence, users would be taken to another webpage entitled "License and Support Agreements."  *Id.* at 23-24.  That page instructed that "You must read and agree to the license agreement terms BEFORE acquiring a product" and "BEFORE you install the software."  *Id.* at 24.  Below that advisement was a link to a license agreement for a "product family" that included the SmartDownload program in question.  *Id.*  That license agreement stated that installation of the program constituted agreement to the licensing terms, including a requirement that disputes arising from use of the software would be subject to arbitration.  *Id.*

Faced with the defendant's motion to compel arbitration, the court examined whether a contractual agreement had been formed.  It first noted that contractual formation questions implicate state law, and concluded that California law governed.  *Id.* at 28-29 & n. 13.  It noted

---

[1]*Specht* is actually the story of two software programs.  One, "Netscape Communicator," involved a standard clickthrough agreement, by which the user would be unable to install the program without clicking a button stating that the user expressly agreed to the program's license terms.  The second program, "SmartDownload," was installed as described above.

that under California law, acceptance of an offer was judged from an objective standard, rather than what the offeree subjectively understood itself to be agreeing to, but that "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Id.* at 30.  Turning to the question of whether an objectively reasonable user would have reviewed the license terms before downloading the software, the court concluded that the user would not, noting that the offer "did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of consent," and that the contractual nature of the document containing the terms themselves was "not obvious." *Id.* at 31.  It stated that "where consumers are urged to download free software at the immediate click of a button, a reference to the existence of license terms on a submerged screen is not sufficient to play consumers on inquiry or constructive notice of those terms."[2] *Id.* at 32.  It concludes by noting that "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential." *Id.* at 35.

Colorado contract law bears some similarity to the California law assessed in *Specht*.  For example, Colorado law also determines whether an offeree has accepted an offer by an objective standard – whether the offeree's words or conduct, objectively-viewed, manifests an intent to accept. *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo.App. 2008); *Scoular Co. v. Denney*, 151 P.3d 615, 619 (Colo.App. 2006).  Although the Court has not located Colorado authority for the

---

[2]The rule stated by the *Specht* court is fairly dense with qualifiers.  For example, the rule clearly applies only to "free" software.  As the court later explains, "[w]hen products are 'free' and users are invited to download them in the absence of reasonably conspicuous notice that they are about to bind themselves to contract terms," analogies to existing contract law are not necessarily valid. *Id.* at 32.

proposition that objective indicia of assent can be overcome where the terms of the agreement were inconspicuous or concealed from the offeree, that proposition is not particularly remarkable. When a party is unaware of a term of a contract because it was hidden or obscured, there can be no presumption that there was a meeting of the minds as to such term.  Thus, the Court is inclined to assess the contact formation issues here according to the same standard as *Specht* – that is, ascertaining whether the contractual terms were "reasonably conspicuous" and whether Mr. Grosvenor's alleged assent to them was "unambiguous."

Accordingly, the Court turns to the parties' evidence. In large part, the underlying facts are not in significant dispute.  Mr. Grosvenor first subscribed to Qwest internet service in mid-2006.  Qwest sent him a disc containing certain software to install to activate the service.  When first opened, the install window contains the title "Legal Agreements" and states "Please read the terms *including arbitration and limits on Qwest liability* at www.quest.com/legal ("Qwest Agreement") that governs your use and Qwest's provision of the service(s) and equipment you ordered from the list below."  (Emphasis in original.)  Among the listed services is "Qwest High-Speed Internet Service," the product Mr. Grosvenor had ordered.  The text then continues, stating "Please also read the (1) information on term and early termination fee, and (2) disclaimers and the end use license agreement related to the installation and software you receive during in ("Install Agreements") in the scroll box below."

Below that text is a box entitled "Important, Binding Legal Information."  The box displays six lines of text, and contains a scroll bar that allows the user to scroll through additional text.  As initially displayed, the first six lines of text read:

> Your click below on "I Accept" is an electronic signature and
> acknowledges: (1) you agree the Qwest Agreement contains the

terms under which service and equipment are provided to you, (2) you understand and agree to such terms, (even if you don't read them), and (3) you understand and agree to the Install Agreements. Federal and some state laws provide for certain disclosures and the relevant language from the federal act is in this scroll box or at www.qwest.com/legal/electronicsignatures.html.  You may get a paper copy of the agreements free of charge by printing from this page and www.qwest.com/legal.  Qwest does not otherwise provide you with a paper copy.  A standard connection to the Internet/World Wide Web, a device that sends and accepts standard email, and a software program that[3]

Below the box, text reads "Your click on 'I Accept' is an electronic signature to the agreements and contracts set out herein.  Please review the material in the above box for important, binding legal information."  The user may then click on a button that says "I Accept" or a button that says "Cancel."  The software installation will not proceed unless the user clicks on the "I Accept" button.

Before delving further, the Court pauses at this point to assess what a reasonable user would understand from this information.  From the upper portion of the installation window, the user would be aware that there are "terms [of service] including arbitration and limits on Qwest's liability" that accompany the user's use of the internet service.  The user would also reasonably understand that those terms are not being presented in the window itself; rather, the user would understand that those terms – collectively referred to as the "Qwest Agreement" – must be viewed at the web address of www.qwest.com/legal.  In addition, the user would recognize that

---

[3]Mr. Grosvenor states that the remaining material contained in the scroll box comprises approximately 10 pages of text.  Most of that material is irrelevant to the issues presented here. However, section 7.2 of the material in the scroll box describes "Remedies and Legal Actions." Section 7.2(b) states that "Any dispute with SupportSoft, Inc.[apparently the author of the installation software] regarding the agreement" will be litigated in California. Section 7.2(c) states that "All other dispute regarding this Agreement" shall be litigated in courts in Colorado. As best the Court can see, the text in the scroll box makes no mention whatsoever of arbitration.

there are additional agreements – referred to as the "Install Agreement" – as reflected in the scroll box.  Both the immediately-visible terms of the Install Agreement as well as information found below the scroll box indicate to the user that clicking on the "I Accept" button manifests the user's acceptance of both the Qwest Agreement and the Install Agreement.

Mr. Grosvenor contends, and Qwest apparently does not dispute, that a user who navigated to www.qwest.com/legal on or about the 2006 installation date would have found that the main body of the page consisted of several paragraphs of various legal notices that are unrelated to the issues presented here.  On the left side of the page, however, are a list of links to other pages, as set forth below:

- Legal Notices
- Customer Proprietary Network Information Sharing
- Acceptable Use Policy
- Service Level Agreement
- CPE
- Regulatory Documents
- Arizona Consumers
- Washington Consumers
- Colorado Consumers
- Network Disclosures
- High-Speed Internet Subscriber Agreement
- Qwest Choice TV & Online Legal Notices
- North America IP Network Peering Policy
[etc.]

If the user clicked on the link for "High-Speed Internet Subscriber Agreement," it would be taken to another page that contains the arbitration agreement, class action limitation, and other terms relevant to the claims here.

To summarize, a user activating Qwest internet service would become aware of the terms of the agreement (and manifest assent) through the following steps: (i) the installation software directs the user to "Please read the terms . . .  at www.quest.com/legal . . . that governs . . . the

service(s) and equipment you ordered."; (ii) the user would navigate to the linked page (the "legal" page); (iii) the user, installing Qwest high-speed internet service, would then click on the "High-Speed Internet Subscriber Agreement" link on that page, thus being taken to yet another page; (iv) the user would review that subscriber agreement; and (v) the user would return to the installation software and manifest assent to the subscriber agreement by clicking "I Accept." The question, then, is whether these facts constitute "reasonably conspicuous notice" of the agreement's terms.

*Specht* is too factually distinct from this case to offer meaningful guidance.  There, the users were attempting to download a free product, 306 F.3d at 31, not install a service they were subscribing to; they were first faced with "a screen containing praise for the product" and no immediate mention of contractual terms, *id.* at 31-32, rather than an installation window expressly directing the user to terms governing the use of the service; and users in *Specht* were not asked to expressly manifest their assent to such terms, *id.* at 32, whereas Qwest required Mr. Grosvenor to affirmatively express his assent to license terms in order to complete the installation.

The other cases cited by Mr. Grosvenor in his summary judgment response are equally inapplicable.  *Schnabel v. Trilegiant Corp.*, 2011 WL 797505 (D.Conn. Feb. 24, 2011) (slip op.), *Cvent, Inc. v. Eventbrite, Inc.*, 739 F.Supp.2d 927, 937 (E.D.Va. 2010), and *Hines v. Overstock.com, Inc.*, 380 Fed.Appx.22 (2d Cir. 2010), all involved users who were not required to manifest their assent to stated terms and conditions before obtaining the services they sought. In *Schnabel*, the plaintiff's clicking of a button manifested his agreement to sign up for a particular promotion, but the terms to which he was agreeing consisted only of the fact that he

would be billed a certain amount each month; no mention of any other terms or conditions, much less the agreement to arbitrate that was ultimately raised, was made to the user until after he had already accepted the promotion's offer.  Both *Cvent* and *Hines* involved contentions by the defendant that users of their websites were bound by terms and conditions expressed on a page within the site, on the assumption that the user's use of the site constituted implicit agreement with those terms; in neither case was the user required the affirmatively manifest its assent to those terms.  *See also Hoffman v. Supplements Togo Management, LLC*, 18 A.3d 210, 213, 219-20 (N.J. App. Div. 2011) (statement that user's placing of an order constituted agreement to choice of law provision not sufficient notice of terms where user's click to place item in shopping cart might prevent user from seeing such term).  Thus, these cases are not persuasive in demonstrating that a user who affirmatively expresses assent to terms whose <u>existence</u> is conspicuously disclosed but whose <u>contents</u> can only be discovered with additional navigation prevents formation of a contract.

Several cases have concluded that where, during a software installation, the user is presented with the text of an agreement in a scroll box and required the click a button expressing assent to those terms before installation continues, a contract is formed.  *See e.g. Caspi v. Microsoft Network, LLC*, 732 A.2d 528, 532 (N.J. App. 1999); *Forrest v. Verizon Communications, Inc.*, 805 A.2d 1007, 1010 (D.C. App. 2002); *Moore v. Microsoft Corp.*, 741 N.Y.S. 2d 91, 92 (N.Y. App. 2002).  Rarer are cases in which, rather than presenting the terms of the agreement in a scroll box, the installation software directs the user to the terms of the agreement through a link to a different location.  *See Harris v. comScore, Inc.*, ___ F.Supp.2d ___, 2011 WL 4738357 (N.D.Ill. Oct. 7, 2011) (denying motion to dismiss where plaintiff

alleged that the link to the terms of service was "obscured during the installation process," and that the defendant had not come forward with an explanation as to "how the hyperlink to the agreement was presented to the user," but recognizing that "further factual development" might reveal that "the terms of the license agreement were reasonably available during the installation process"). Nevertheless, the reasoning in "scroll box" cases applies with equal force where, rather than scrolling through an agreement's terms in a text box, the user can review the license terms by following the tendered link.

There are two facts that are unique to this scenario. First, Mr. Grosvenor could not review Qwest's terms of service simply by clicking on the link www.qwest.com/legal; doing so would have only taken him to a page where he would have to continue to search for a link to the applicable contractual terms. The Court cannot say that, as a matter of law, requiring a user to navigate through two links in order to review the terms of an offer prevents any contractual formation, each additional step required of the user tips against a finding that the terms were sufficiently conspicuous. Second, and perhaps more importantly, the fact that a user must navigate to a web page in order to ascertain terms of an offer is particularly difficult where the software being installed is the means by which the internet can be accessed. In the absence of some other means of accessing the internet, Qwest's program did not allow Mr. Grosvenor to go to www.qwest.com/legal or review the applicable documents. The record does not reflect whether Mr. Grosvenor had other operative internet service when he began installation of Qwest's software. In the absence of other operative internet service, Mr. Grosvenor had no way of assessing the terms of Qwest's agreements until he completed installation of the software, and completion of the software installation would not occur until Mr. Grosvenor manifested his

acceptance of the terms or the agreement.   Under these circumstances, where there is no

assurance that a user could view the operative terms prior to agreeing to them.  Thus, despite the

representations made as to the effect of pressing the "I Accept" button,  the Court has some

doubt that doing so created an enforceable contract.

Second, it is undisputed that on July 24, 2006, Qwest followed up Mr. Grosvenor's

activation of his internet service by sending a "Welcome Letter."  That letter – which Mr.

Grosvenor does not dispute receiving although he professes no specific recollection of it –

includes a paragraph reading "Please review the important information about service and terms

for use . . . on the back of this letter." The back of the letter contains the following text:

> Qwest High-Speed Internet Service and related products are
> offered under the Subscriber Agreement terms, which are located
> at www.qwest.com/legal (may also be encolosed).  Please review
> the terms, which include arbitration and limits on Qwest liability.
> If you do not agree, call Qwest to cancel your service within 30
> days.

The Welcome Letter alleviates some of the issues noted above.  First, it eliminates some

of the confusion in the software's reference to the "Qwest Agreement."  The Welcome Letter,

specifically directs Mr. Grosvenor to the "Subscriber Agreement" on the qwest.com/legal page

as being the document containing terms of service, "includ[ing] arbitration and limits on Qwest

liability."  Although the "legal" page does not immediately display the Subscriber Agreement,

users navigating to that page can readily locate the Subscriber Agreement, because there is only

one link on the "legal" page referring to a "Subscriber Agreement."  The Welcome Letter,

having arrived after internet service software was installed, also addresses the user's potential

difficulty in accessing the terms of Qwest's offer in the absence of internet service.  Finally, the

letter provides time in which to consider the terms of the Subscriber Agreement without the

inherent urgency associated with installing the software.  It  instructs users who do not agree to the terms of the offer to "cancel your service" within 30 days, and thus, a user who does not cancel service is assumed by Qwest to have assented to the agreement's terms.  Mr. Grosvenor did not cancel his Qwest internet service.

Taking the circumstances as a whole, the Court finds that on the undisputed facts presented here, Mr. Grosvenor's conduct constitutes an objective manifestation of assent to the contractual terms.  Although the presentation of the terms is hardly a model of clarity, the Court nevertheless finds that they were sufficiently conspicuous as to permit a reasonable user the opportunity to review them and either agree to them or to cancel the internet service.  Among other things, the installation software conspicuously warned users of the <u>existence</u> of contractual terms that accompanied the service, specifically mentioning arbitration as one of the issues addressed.  The software provided users with a link by which a reasonable user could locate – albeit with some effort – the relevant contractual language, and required that the user affirmatively express its acceptance of Qwest's terms.  To the extent that presentation of the terms via the installation software can be said to be impractical or unclear, the Welcome Letter would be sufficient to cure a reasonable user's confusion.  That letter expressly identified arbitration as one of the important terms to be reviewed by the user, sufficiently identified the particular link on the "legal" page that contained the agreement, and arrived at a time when the user would certainly be able to access the internet to view the identified terms.  The letter provided that the user's continued use of the service after 30 days effectively manifested assent to the agreement's terms.  Although the Court declines to opine as to whether either presentation of the terms – the software installation and the Welcome Letter – would, of itself, be sufficient, it

finds that the combination of the two presentations rendered the contractual terms specifically

clear that a reasonable user would be deemed to have understood the terms and assented to them.

Accordingly, the Court finds that Mr. Grosvenor entered into a contractual agreement with

Qwest in July 2006, in which he agreed to arbitrate disputes over his purchase of internet service.

Mr. Grosvenor argues that, even if he entered into a contract during the July 2006

installation, he did not purchase the "Price for Life" service that is at issue in this case until he

upgraded his service in November 2007.  Mr. Grosvenor argues that the November 2007 upgrade

constituted a new contract with Qwest.  He contends that he was not required to re-install any

software when upgrading his service in November 2007, and Qwest does not dispute that

assertion.  However, the record does indicate that Mr. Grosvenor was sent another Welcome

Letter in conjunction with the November 2007 upgrade, the contents of which are identical to

one he received in 2006. Mr. Grosvenor did not terminate his Qwest service at this time, either.

The Court has some doubt that the November 2007 upgrade constituted a new contractual

agreement between the parties.  But assuming it did, the Court has already concluded that the

combination of installation software and Welcome Letter from 2006 were sufficient to advise

Mr. Grosvenor or the terms of his agreement with Qwest for using the internet service.  Thus,

when Mr. Grosvenor received another Welcome Letter in 2007, he cannot reasonably contend

that the contract terms that he previously agreed to were no longer clear to him.  The 2007

Welcome Letter was sufficient, of itself, to "refresh" Mr. Grosvenor's understanding that Qwest

required his assent to certain terms for use of the service, and to point Mr. Grosvenor to a

location where he could review such terms.  Consistent with the terms of the letter, Mr.

Grosvenor's continued use of the service manifested his continuing acceptance of those terms.

Mr. Grosvenor argues that the 2007 Welcome Letter was "misleading," insofar as it purported to allow him 30 days to cancel his service if he disagreed with the terms of use, but that, as an upgrading customer, the Subscriber Agreement prohibited him from availing himself of the 30-day cancellation policy.  But this argument fails to mesh with Mr. Grosvenor's position in this case.  If, as Mr. Grosvenor contends, his 2007 service upgrade gave rise to an entirely new contract with Qwest[4] – one in which he was no longer bound by his prior agreement to the service terms – it would not be appropriate to consider him an "existing customer" that would be prevented from cancelling his service within 30 days.  If, on the other hand, he retained his status as an existing customer of Qwest – one that is merely modifying an existing service –when upgrading, there is no reason why he would not remain bound to the contractual agreement he entered into when first obtaining that service.

Accordingly, the Court finds that, on the undisputed facts presented herein, Mr. Grosvenor manifested his assent to clearly-disclosed contractual terms that, among other things, included an agreement to arbitrate disputes.  Thus, Mr. Grosvenor's breach of contract claims are subject to that agreement to arbitrate unless, as discussed below, that obligation to arbitrate is somehow rendered unenforceable.

**C.  Mr. Grosvenor's motion**

Mr. Grosvenor moves for summary judgment, arguing that any agreement to arbitrate

---

[4]The Court notes, in passing, that the 2006 Welcome Letter states that Mr. Grosvenor's internet service was "Qwest Choice DSL Deluxe with MSN Premium 24-month term commitment."  It would appear, then, that Mr. Grosvenor was still subject that 24-month commitment with Qwest when he upgraded his service 16 months later.

that he may have entered into is illusory and thus unenforcible because Qwest reserved the unilateral right to change terms of the agreement.  Mr. Grosvenor points out that Section 4 of the Subscriber Agreement provides that "Qwest may . . . modify the Service and/or any of the terms and conditions of this Agreement."[5]  This, Mr. Grosvenor argues renders the agreement illusory under *Dumais v. American Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002).  In *Dumais*, the 10th Circuit explained that "an arbitration agreement allowing one party the unfettered right ro alter the arbitration agreement's existence or its scope is illusory."  *Id.* at 1219.

Qwest offers several arguments in response.  First, it contends that challenges to the enforceability of the contract as a whole (rather than challenges to the enforceability of the arbitration clause) are questions that are reserved to the arbitrator, not the courts. Qwest cites to *Prima Paint Corp. v. Flood & Conklin Mfg. Co*, 388 U.S. 395 (1967) and *Rent-A-Center West, Inc. v. Jackson*, 130 S.Ct. 2772 (2010), in support of this contention.

In *Prima Paint*, the parties entered into a contract to jointly do business together, including a term requiring arbitration of disputes.  The plaintiff later alleged that the defendant fraudulently induced it into agreeing to the contract's terms because the defendant was not sufficiently solvent to engage in the joint business contemplated by the agreement.  The defendant sought to invoke the arbitration clause, but the Supreme Court found that the question of whether the validity of the contract was a question for the court or for an arbitration turned on whether the challenge went to the narrow issue of the parties' agreement to arbitrate, or the

---

[5]Section 4 further provided that Qwest was not required to give notice to users of any change in the agreement's terms, and that the changes became "effective upon posting to www.qwest.com/legal."  It also stated that a user's continued use of the service after such changes were posted constituted acceptance of the changes.

broad question of parties' agreement as a whole. "A federal court may consider only issues relating to the making and performance of the agreement to arbitrate," it explained, and if the challenge instead went to the validity of the contract as a whole, not specifically targeting the validity of the arbitration clause, the matter was one for the arbitrator to resolve. *Id.* at 403-04, *citing* 9 U.S.C. § 4 (court shall order arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue")

In *Rent-A-Center*, the defendant employee brought discrimination claims against his employer, and the employer sought to compel arbitration of those claims pursuant to an arbitration agreement that the employee signed at the start of his employ. The employee opposed arbitration, arguing that the agreement to arbitrate was unconscionable and thus unenforceable. Rent-A-Center responded that the agreement expressly provided that an arbitrator would have "authority to resolve any dispute relating to the enforceability of this Agreement including, but not limited to, any claim that all or any part of this Agreement is void or voidable." The Supreme Court explained that "there are two types of validity challenges" is cases such as these: "one type challenges specifically the validity of the agreement to arbitrate and the other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." 130 S.Ct. at 2778. Citing *Prima Paint* and others, the Court explained that the first type of challenge was one that had to be resolved by the courts, but the latter "does not prevent a court from enforcing a specific agreement to arbitrate." *Id.* In essence, the Court concluded that "an arbitration provision is severable from the remainder of the contract," and so long as the arbitration provision itself is

not alleged to be void or voidable, defects in the contract generally are matters for the arbitrator. *Id.* ("where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract-we nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene").

Here, it appears that Mr. Grosvenor's invocation of *Dumais* is an attack on the arbitration provision, rather than an attack on the illusory nature of the Subscriber Agreement as a whole. *Dumais* itself does not purport to address issues of illusory contracts generally; it is pinpoint-specific in stating that "we joint other circuits in holding that <u>an arbitration agreement</u> allowing one party the unfettered right to alter [its terms] is illusory." 299 F.3d at 1219 (emphasis added). More importantly, Mr. Grosvenor's claims in this case indicate that he is not contending that the entirety of his agreement with Qwest was illusory; indeed, he seeks to enforce the agreement (particularly the "Price for Life" program). Because Mr. Grosvenor is attacking only the validity of the arbitration clause, cases like *Prima Paint* and *Rent-A-Center* instruct that it is the obligation of the Court, rather than the arbitrator, to determine whether the arbitration clause is illusory.

Qwest contends that *Dumais* is incorrectly-decided. Qwest states that a contract should be deemed illusory only if no other consideration for the agreement as a whole has been exchanged. Assuming that Qwest's arguments on this point are correct – and this Court makes no such finding – this Court is not permitted to deviate from 10th Circuit precedent that appears to be controlling in this scenario.

Qwest also argues that *Dumais* is factually-distinguishable from this case (and thus not controlling). First, it contends that in *Dumais*, "the employer had taken great pains to ensure that

no provision in the handbook or employment documents other than the arbitration provision was binding on the employer," and thus, the agreement to arbitrate was the only contractual agreement between the parties, such that if the arbitration clause was not secured by consideration, the entire agreement was rendered illusory.  Qwest appears to infer this from *Dumais*, but the Court finds nothing in *Dumais* suggesting that such inference is reasonable. Indeed, *Dumais* seems to indicate that the employee also agreed to be "bound . . . to the provisions of American Golf's employment handbook."  299 F.3d at 1217.  Admittedly, the employer reserved the right to modify the provisions in the handbook (including the arbitration provision) at its sole discretion, but that does not distinguish *Dumais* from this case.  To the contrary, in this regard the facts of Dumais are similar to those presented here because Qwest reserved the right to modify any of the provisions in the Subscriber Agreement (including the arbitration provision) at its sole discretion.

Second, Qwest argues that *Dumais* the employer was not required to give the employee notice of any changes the employer might make, whereas the Subscriber Agreement requires Qwest to do so.  There appears to be  no foothold for this argument in *Dumais;* it contains no findings with regard to whether the employer was required to provide notice of changes in the agreement.[6]

Even so, the Court is not convinced that a simple requirement that Qwest post any

---

[6]In parentheticals discussing other cases, the court in *Dumais* noted that <u>those</u> cases permitted the employer to make changes to the arbitration clause "without notice," but otherwise, the word "notice" does not appear in *Dumais*.  299 F.3d at 1219.

changes it makes to its agreement to a remote webpage is material.[7] A notice requirement becomes significant when it is coupled with the right to accept or reject the change.  Here, nothing in the Subscriber Agreement indicates that Qwest's changes to the Subscriber Agreement are subject to delayed effect for consideration by the user or to the user's and consent.  *Compare Taylor v. First North American Nat. Bank*, 325 F.Supp.2d 1304, 1315 n. 18 (M.D.Ala. 2004) (distinguishing *Dumais* from a contractual agreement that "requires the bank to notify Taylor before changing the terms of her cardmember agreement and provides that 'Failure to surrender your Account Card prior to the effective date of the change will constitute your consent to the change in terms she can avoid any new terms by cancelling her card.' In other words, Taylor must assent to any change").  The agreement simply states that changes become "effective upon posting to www.qwest.com/legal,".[6]

Mr. Grosvenor argues quite persuasively that the terms of the Agreement treat his act of accessing the internet to see if changes have been made to the agreement as "use of the service," and therefore his assent to changes he desired to review.  By conflating the review of the changes with assent to them, there is no right to reject changed terms.

---

[7] Qwest does not offer any reasonable explanation why users like Mr. Grosvenor would periodically visit www.qwest.com/legal and attempt to ascertain whether any terms in the Subscriber Agreement had changed since their last visit (without any apparent help from Qwest, as no redlined version, changelog, or other information is provided to guide users to recent changes in the agreement's terms).

[6] Qwest notes that another portion of Section 4 of the agreement states that certain changes to the agreement become effective "upon 30 days notice to you."  However, the changes encompassed by that provision are those that "directly result[ ] in a material and adverse economic impact to you."  Notwithstanding footnote 1 in Qwest's response brief, it is by no means clear that, if Qwest elected to change any of the terms of the arbitration agreement, it would necessarily consider those changes to pose a "material and adverse economic impact" to its users, such that express notice and delayed implementation of those changes would apply.

Qwest also argues that there is no evidence of record establishing that it has changed the arbitration terms. This is true, but irrelevant. The court in *Dumais* gave no indication that the employer had to have altered the terms of the arbitration agreement in order for it to be illusory. To the contrary, it recognized that it was the unilateral power of one party to change the arbitration terms that rendered the arbitration provisions illusory.

The Court finds that *Dumais* controls the outcome of Mr. Grosvenor's motion. Because Qwest retained an unfettered ability to modify the existence, terms and scope of the arbitration clause, it is illusory and unenforceable.[7]

## CONCLUSION

For the foregoing reasons, Qwest's Motion for Summary Judgment **(# 106)** is **GRANTED**, in so far as the Court finds that Mr. Grosvenor entered into a contractual agreement with Qwest upon his installation of the internet service and continued to be bound by that agreement throughout the events at issue here. This fact is deemed established for purposes of these proceedings.

However, Mr. Grosvenor's Motion for Summary Judgment **(# 105)** is also **GRANTED**, insofar as the Court finds that the arbitration clause in that agreement is illusory and thus unenforceable.

---

[7]The parties have not addressed the question of whether the class action waiver found in Section 17(b) of the Subscriber Agreement falls outside of *Dumais*, such that it remains enforceable, nor the extent to which that issue informs Mr. Grosvenor's intention of pursuing this case as a class action. Thus, the Court does not consider those issues at this time.

The Court directs that the parties contact the Magistrate Judge forthwith to set a

Scheduling Conference to address what remains to be done to prepare this matter for trial.

Dated this 23rd day of February, 2012

**BY THE COURT:**

Marcia S. Krieger
United States District Judge